**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                                    :
THE UNITED STATES OF AMERICA,    :                    JURY TRIAL DEMANDED
                                                    :
            Plaintiff,                        :
                                                    :                    Civil Action
      v.                                        :                    No. _____
                                                    :
FIRST STATE MANUFACTURING, INC., :
                                                    :
            Defendant.                     :
_____:

## COMPLAINT

      This procurement fraud case involves bribery and bid rigging. Defendant First State

Manufacturing, Inc. ("FSM"), a textile manufacturer in Milford, Delaware, secured nearly $8.3

million in National Passenger Railroad Corporation ("Amtrak") funds by bribing an Amtrak

procurement official, Timothy Miller, with cash payments and beach vacations. FSM's

executives orchestrated this scheme to help the company's bottom line.

      In exchange for this bribery, Miller provided FSM with bidding information that allowed

FSM to win contracts. And once FSM won the contracts, Miller allowed the company to furnish

substandard textile products and inflate the prices. Doing so undermined the fairness of Amtrak's

competitive bidding process and caused Amtrak to overpay. FSM concealed the bribery scheme

by directing Miller to establish a fake company, falsifying records, and paying Miller, an Amtrak

employee, as FSM's "consultant." For his role in this scheme, Miller was sentenced to one year

and one day incarceration. Donald Scott Crothers, FSM's Vice President for Marketing and

Contract Administration, received a sentence of eighteen months in jail for his role in the

scheme. John Gonzales, FSM's Chief Executive Vice President and Chief Financial Officer, is

still awaiting sentencing. While the individual FSM executives were charged for this scheme and

1

pled guilty, the primary beneficiary of the bribery, FSM itself, has escaped any accountability. The United States therefore brings this action under the False Claims Act, 31 U.S.C. §§ 3723-3733, seeking treble damages and penalties against FSM.

## PARTIES

1.     Plaintiff is the United States of America.

2.     Defendant FSM is a corporation with a principal place of business at 301 S.E. 4th Street, Milford, Delaware.

3.     Between 2014 and 2018, FSM supplied Amtrak with textiles—including seat cushions, seat covers, flooring material, and carpet—through contracts, purchase orders, and invoices.

4.     Amtrak was FSM's biggest client, making up approximately 35% of the company's work.

## JURISDICTION AND VENUE

5.     This Court possesses subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1345.

6.     Venue is proper under 28 U.S.C. §§ 1391(b) and 1391(c), and under 31 U.S.C. § 3732(a).

## ADDITIONAL KEY INDIVIDUALS

7.     Amtrak is a federally-established corporation that provides passenger rail services in the United States. Although Amtrak operates as a for-profit corporation rather than a public authority, the Secretary of the U.S. Department of Transportation ("DOT") sits on its ten-member board of directors, and eight other members are appointed by the President and confirmed by the U.S. Senate. The federal government owns all of Amtrak's preferred stock.

8.      The Federal Railroad Administration ("FRA"), an agency within the United States DOT, administers grant agreements that provide Amtrak with federal funds appropriated by Congress. In conjunction with operating revenues and funds from states, local governments, and other entities, Amtrak uses federal funds for its operating and capital activities, including a portion of its operating expenses, capital maintenance of fleet and infrastructure, capital expansion and investment programs, and capital debt repayment. DOT, through its annual budget submission, and Amtrak, through its annual Grant and Legislative Request, provide Congress with recommended appropriated amounts.

9.      Donald Scott Crothers was FSM's Vice President for Marketing and Contract Administration. At the beginning of the scheme described below, he served as the company's Director of Marketing & Contract Administration.

10.     John Gonzales was FSM's Executive Vice President and Chief Financial Officer. He worked at FSM for approximately ten years and was responsible for the company's financial policies, procedures, control, and internal reporting systems. Gonzales oversaw cost analysis, production, product development, sales and marketing initiatives.

11.     Timothy Miller was a Lead Contract Administrator at Amtrak's Procurement & Logistics Department ("Procurement"), in Philadelphia, Pennsylvania. He was responsible for procuring equipment and services, as well as managing the account for Amtrak diesel and locomotive seat cushion vendors. He was also responsible for compiling, reviewing, and comparing the vendor bid submissions for each Amtrak contract within his portfolio, including equipment and services. Amtrak expected Miller to act on its behalf and in its best interest.

12.     David Hitchens was FSM's CEO and President from the beginning of the bribery scheme in 2014 until his death on May 13, 2016.

3

13.     Eliseo Valenzuela and Cheryl A. Valenzuela, husband and wife, reside at █████

████████████████████

14.     Mr. Valenzuela is FSM's co-founder, co-owner, and current President and CEO. He is involved in the company's day-to-day operations. During the bribery scheme outlined below, Mr. Valenzuela also served as the Chairman of FSM's Board of Directors and participated in executive and board meetings where the bribes to Miller were discussed.

15.     Mrs. Valenzuela is FSM's co-founder, co-owner, and current Executive Vice President of Marketing and Administration. During the bribery scheme outlined below, she served as Secretary of FSM's Board of Directors. Similar to Mr. Valenzuela, she participated in executive and board meetings where the bribes to Miller were discussed.

## FACTUAL ALLEGATIONS

**I.     To start the scheme, FSM improperly encouraged its employees to seek out confidential pricing information.**

16.     The scheme started when Mr. Valenzuela encouraged FSM subordinates to seek out confidential pricing information to help the company win bids to supply parts to Amtrak.

17.     Amtrak periodically buys carpets, seat cushions, and other parts necessary to maintain its passenger rail cars.

18.     Depending on the contract value, Amtrak procures these things through a competitive bidding process by inviting approved vendors to submit proposals.

19.     When Amtrak prepares to launch this process, vendors routinely request a sample of the item to be provided under the forthcoming contract. The vendor can review the sample and estimate the vendor's cost to reproduce it for purposes of bidding on the contract.

20.     Although not public, Amtrak routinely provides inventory lists to vendors who request information about samples.

4

21.     On August 23, 2013, consistent with that practice, an Amtrak employee sent FSM an Excel spreadsheet with a list of samples. The spreadsheet also listed the cost for each sample.

22.     Mr. Valenzuela—President of FSM at the time—believed that Amtrak had given FSM confidential pricing information, resulting in an unlawful competitive advantage. Rather than disclose the issue to Amtrak, he replied to an email containing the information and carbon-copied Mrs. Valenzuela with the following message:

**From:** Eli Valenzuela
**Sent:** Friday, August 23, 2013 2:09 PM
**To:** Scott Crothers; Dave Hitchens; Ian Littlejohn; John Gonzales
**Cc:** Sher Valenzuela
**Subject:** RE: Pricing Info

WOW !! imagine that, where else are we going to get this much intel? We even get to see the current prices!! This is the kind of stuff that stays with in FSM, those named above, one wrong ear and the opposition/ incumbent could challenge our contract victory.  I hope this is clear. If Andrea knows about this info, somebody needs to stress the importance of not talking to vendors about it.

Thoughts?

ELI VALENZUELA  |  President
First State Manufacturing

23.     Mr. Valenzuela marveled at the possibility of using—what he believed to be—confidential pricing information to FSM's advantage, including keeping it secret to avoid "the opposition/incumbent . . . challeng[ing] [FSM's] contract victory."

24.     Underscoring the importance of secrecy, Mr. Valenzuela warned everyone that "one wrong ear" could cause FSM to lose the contract—i.e., FSM could lose the contract if even one wrong person found out that the company possessed confidential pricing information. Mr. Valenzuela therefore reiterated, "I hope this is clear," and "somebody needs to stress the importance of not talking to vendors about it."

25.     By celebrating this purportedly secret, propriety information, Mr. Valenzuela approved and encouraged his subordinates on the email—Hitchens, Gonzales, and Crothers—to seek out additional inside information related to Amtrak contracts.

26.     It didn't take long for that to happen. Shortly after Mr. Valenzuela sent his email, FSM began cultivating a relationship with Miller in Amtrak's procurement office.

**II.     FSM sought out Miller and started bribing him to receive contracts.**

27.     In the spring of 2014, Crothers and Mr. Valenzuela met with Miller to discuss whether FSM could furnish seat cushions for passenger trains.

28.     FSM could not supply the seat cushions, however, until it became an approved Amtrak vendor. As part of Amtrak's supplier qualification process, vendors must submit drawings/designs of each part they intend to supply.

29.     FSM therefore submitted drawings/designs for the seat cushions to become an approved vendor.

30.     FSM failed to meet the appropriate standards in part because it submitted substandard drawings/designs. These failures caused Amtrak personnel to spend hundreds of hours working with the company to improve the quality of its submissions.

31.     Ultimately, on or about June 6, 2014, Amtrak approved FSM as a vendor and seat cushion supplier.

32.     FSM's relationship with Miller blossomed from there. To recover the costs of becoming an approved vendor, FSM asked Amtrak to pay the company more than $65,000 in mid-2014. Miller processed and approved these payments to FSM—a highly unusual move, and something that he did not do for FSM's competitors.

33.     To reward this behavior and to encourage more of it, FSM offered Miller an all-expense-paid vacation in early 2015.

34.     Miller accepted. From February 20-22, 2015, FSM paid for him to take a vacation in Rehoboth Beach, Delaware.

35.     Realizing an opportunity to exploit the relationship further, FSM began bribing Miller in exchange for inside information—the same kind of information that Mr. Valenzuela believed to have received, and celebrated, in his email.

**III.     FSM bribed Miller to secure Amtrak work worth nearly $8.3 million.**

36.     As discussed in detail below, FSM bribed Miller with cash payments and additional beach vacations in order to win at least the following six Amtrak contracts totaling nearly $6.4 million, as well as additional work not tied to a specific contract, valued at $1.8 million:

| Example No. | Date | Contract Description | Initial Contract Value | Change Orders and Updated Contract Value | Total Spend as of April 2018 | Number of Claims (Invoices) |
|---|---|---|---|---|---|---|
| 1 | August 1, 2015 | BPO1003270 (the "Original Carpet Contract") | $1,730,000 | | | |
| 2 | January 15, 2016 | 4600000029 (the "New Seat Cushions Contract") | $3,773,949 | | $1,217,446.35 | 187 |
| 3 | February 1, 2016 | 4600000023 (the "R&R Cushions Contract") | $900,000 | $2,117,288 | $1,401,430.82 | 387 |

| 4 | August 2, 2016 | BPO1003270 (the "Renewal of Original Carpet Contract") | $636,951.21 | $3,090,332 | $2,366,951.21 | 417 |
|---|---|---|---|---|---|---|
| 5 | July 1, 2017 | 4600000138 (the "Refresh Carpet Contract") | $135,871 | $214,871.06 | $214,449.76 | 15 |
| 6 | July 1, 2017 | 4600000145 (the "Refresh Restroom Flooring Contract") | $1,249,022 | $1,249,021.80 | $1,249,021.80 | 23 |
| 7 | Misc. dates | Invoices not tied to any particular contract | | | $1,819,295.50 | 220 |
| TOTAL: | | | | | $8,268,595.44 | 1,249 |

### A.     FSM bribed Miller to obtain the Original Carpet Contract.

37.     First, FSM bribed Miller to obtain the Original Carpet Contract in 2015.

38.     FSM had laid the groundwork before Amtrak even announced the solicitation. On March 9, 2015, Crothers texted Miller: "Big man! When is the carpet solicitation coming out. We are ready."

39.     Miller responded that another Amtrak employee would be preparing the documentation, and the solicitation would be forthcoming. Crothers responded: "Awesome! All drawings will be completed early next week for all parts."

40.     Crothers followed up the next month by offering Miller another beach vacation at FSM's expense. On April 10, 2015, he texted Miller: "How do you feel about a week at the beach – [Miller], Kaeleen [Miller's ex-wife], and the kids this summer?? Dave [Hitchens, FSM's then-president] wants to extend a 'thank you' your way."

8

41.     FSM's "thank you" materialized a few months later after Amtrak issued the solicitation for the Original Carpet Contract.

42.     On June 3, 2015, Miller and Crothers exchanged the following text messages that connected the beach vacation with the Original Carpet Contract:



43.     A few weeks later, on June 25, 2015, FSM submitted its bid for the Original Carpet Contract.

44.     Later that day, Crothers and Miller exchanged text messages concerning the pricing form for the solicitation.

45.     Ensuring that Amtrak would approve FSM's bid, Crothers took a snapshot of FSM's submission on Amtrak's Procurement page and sent it to Miller:



46.     Miller responded that FSM's bid "[l]ooks good" and assured Crothers that FSM would receive a second chance at bidding—i.e., Miller "will reopen" it—if FSM failed to win the contract.

47.     Crothers also said that Hitchens—FSM's then-president, "Big Dave"—had asked about the status of FSM's bid. According to the text message, Crothers had assured Hitchens that Miller would support FSM.

48.     The next day, Crothers followed up with Miller and asked, "Can you see any of

the bids yet?"

49.     Crothers followed up with him again about a week later: "Please confirm all is

good. In meetings with clients but Dave [Hitchens] is with me and is requesting assurances."

50.     Crothers continued to follow up with Miller as the bidding process unfolded.

Eventually, Miller wrote that he could not see the bids yet.

51.     By June 29, 2015, Crothers urged Miller to relent and "[j]ust give [FSM] the

award."

52.     Miller agreed to do so, as shown in the following text messages:



53.     FSM was persistent. The next day, on June 30, 2015, Crothers asked Miller,

"How do we look?" Miller responded, "[b]ase[d] on what I see is te [sic] best. But still to[o]

early to tell." Crothers responded with two smile emojis and two "money bag" emojis, writing

that "we will do whatever [to] get it all."

54.     FSM's scheme worked: on August 1, 2015, Amtrak awarded FSM the Original

Carpet Contract in the amount of $1,730,000.

55.     Within days of the award, on August 4, 2015, FSM paid Miller a $7,500 bribe for

his assistance in securing the Original Carpet Contract.

**B.      FSM bribed Miller to obtain the Renewal Carpet Contract.**

56.     Second, on August 2, 2016, Amtrak also awarded FSM a renewal of the Original Carpet Contract, referred to as the "Renewal Carpet Contract," in the amount of $636,951.21. FSM did so only after FSM had paid Miller as a sham consultant for the prior eight months, as discussed more fully in paragraphs 102 to 128 below.

57.     Over the course of both the Original Carpet Contract and the Renewal Carpet Contract from August 2015 until December 2017, FSM submitted 417 invoices to Amtrak demanding payment of $2,336,951.21.

**C.      FSM bribed Miller to obtain the New Seat Cushions Contract.**

58.     Third, FSM bribed Miller to obtain the New Seat Cushions Contract in 2016.

59.     FSM again laid the groundwork early. On December 5, 2015, Crothers and Miller texted each other about a cushion order. Miller wrote, "I just paid for your [Puerto Rico] trip. Placed an order for cushion for $55k."[1]

60.     Crothers responded: "You are fabulous! In a few weeks we will both be celebrating some serious $$. Stay amazing!"

61.     Miller replied a few hours later by asking about the amount of FSM's cash bribe for the New Seat Cushions Contract: "Also, If you have any say in how much I get from [Gonzales, FSM's executive vice president and chief financial officer]. Can you try to make it around $30k? No response needed."

62.     Appreciating the benefit that FSM would receive from the New Seat Cushions contract, Crothers agreed to facilitate such a cash payment by telling him, "I have your back big guy!!"

---

[1]      Upon information and belief, Crothers travelled to Puerto Rico from March 24-28, 2016.

63.     On December 8, 2015, Crothers and Miller exchanged text messages about FSM's bid for the New Seat Cushions Contract while also negotiating the company's bid for the R&R Cushions Contract, discussed below at paragraphs 68 to 80.

64.     On January 15, 2016, Amtrak awarded FSM the New Seat Cushions Contract in the amount of $3,773,949.

65.     True to its word, FSM promptly paid Miller a cash bribe for his efforts.

66.     On January 30, 2016, Crothers paid $2,500 to Miller and his ex-wife at a hotel in

Philadelphia, Pennsylvania, as memorialized in the following exchange describing an in-person

handoff:



67.     Over the course of the New Seat Cushion Contract from February 2016 until September 2017, FSM submitted 187 invoices to Amtrak demanding payment in the amount of $1,217,446.35.

**D.     FSM bribed Miller to obtain the R&R Seat Cushions Contract.**

68.     Fourth, FSM bribed Miller for the R&R Cushions Contract in 2016 by giving him another beach vacation.

69.     This time, Miller tipped off FSM that Amtrak would be opening bidding for this work before Amtrak had even issued the solicitation.

70.     FSM therefore began preparing its bid before competitors knew about it.

71.     Between October 14-15, 2015, Crothers and Miller exchanged text messages about FSM's bid. Miller confirmed that if FSM was not the lowest bid, Miller would share competitors' bid information with Crothers to ensure FSM would still win the contract.

72.     The two then discussed their upcoming vacation in Rehoboth Beach, Delaware. The exchange is below:



73.     During the weekend of October 23-24, 2015, FSM paid for Miller to stay in Rehoboth Beach, Delaware.

74.     A few weeks later, in or about November 2015, Amtrak solicited bids for the R&R Cushions Contract.

75.     FSM submitted an initial bid for the R&R Cushions Contract in December 2015, but was not the lowest bidder.

76.     Miller therefore emailed Crothers the following message to help FSM revise its

bid:



77.     On December 8, 2015, Miller gave FSM additional information about the R&R

Cushions Contract by sending Crothers a text message

78.     Acting on all of this inside information, Crothers lowered FSM's bid to $900,000

and resubmitted the company's proposal to Amtrak.

79.     On February 1, 2016, at Miller's encouraging, Amtrak selected FSM's lower bid

and awarded FSM the R&R Cushion Contract in the amount of $900,000, an amount that was

later increased to $2,117,288.

80.     Over the course of R&R Cushion Contract from June 2016 until April 2018, FSM submitted 387 invoices to Amtrak demanding payment in the amount of $1,401,430.82.

**E.      FSM bribed Miller to obtain the Refresh Restroom Flooring Contract.**

81.     Fifth, FSM bribed Miller to obtain the Refresh Restroom Flooring Contract by paying for him to take yet another beach vacation.

82.     On May 25, 2017, Crothers contacted Miller to ask whether FSM would receive the Refresh Restroom Flooring Contract.

83.     FSM was concerned about winning the bid because Alyssa Wesley, another Amtrak Contract Administrator, told Crothers that FSM's competitors had offered similar pricing.

84.     Miller assured Crothers that FSM was "going to get [the contract]," and told him to tell Gonzales, FSM's executive vice president and chief financial officer, that he wanted another weekend getaway in Rehoboth Beach:



85.     Miller advised Crothers to look surprised when FSM received the award.

86.     But FSM hit a temporary roadblock. On or about May 30, 2017, Crothers received

an email from another Amtrak Contract Administrator telling him that FSM would not receive an

Amtrak contract outside of Miller's portfolio.

87.     Within minutes, Crothers forwarded the email to Miller and implored him, "Can

you access the other pricing? This is BS."

88.     Crothers found out what FSM needed to do. Later that afternoon, FSM revised its

pricing and Crothers sent it to Amtrak.

89.     Because FSM had revised its pricing, Amtrak awarded FSM the Refresh

Restroom Flooring Contract with a scheduled value of $1,249,021.80.

90.     Over the course of the Refresh Restroom Flooring Contract from September 2017

until December 2017, FSM submitted 23 invoices to Amtrak demanding payment in the amount

of $1,249,021.80.

**F.      FSM bribed Miller to obtain the Refresh Carpet Contract.**

91.      FSM did not give up there. Sixth, the company tried to leverage the promise of a Rehoboth Beach vacation by securing the Refresh Carpet Contract.

92.      Text messages between Crothers and Miller leave no room for interpretation. On June 2, 2017, Miller texted Crothers: "The carpet bid is coming out next week. $1.8-$2m. When you win[ ] RB [i.e., Rehoboth Beach] either July 8th or July 22nd weekend. Which one works better for you?"

93.      Three minutes later, Crothers responded: "Omg yes! I'm at Dover AFB today. I'm thinking July 22. What carpet do they choose?"

94.      By June 28, 2017, Amtrak required all bidders to submit their bids for the Refresh Carpet Contract.

95.      On the day of this deadline, June 28, 2017, Crothers obtained from Miller confidential price information about FSM's competitors.

96.     Miller instructed him to adjust FSM's prices accordingly so that it could win the

bid:



97.     Within minutes, Crothers adjusted FSM's bid at Miller's encouragement.

98.     On July 1, 2017, FSM won the Refresh Carpet Contract with a scheduled value of

$214,021.80.

99.     Over the course of the Refresh Carpet Contract from June 2017 until February

2018, FSM submitted 15 invoices to Amtrak demanding payment in the amount of $214,449.76.

**G.     Miller approved over $2 Million in FSM invoices not tied to a contract.**

100.    Seventh, from January 2015 until April 2018, while FSM plied Miller with trips

and bribes, the company submitted and Amtrak paid $1,819,295.50 in invoices not tied to any

contract.

101.    Miller approved each of these 220 invoices that ranged from $63.70 all the way

up to nearly $70,000 on a single invoice.

**IV.     FSM funneled money to Miller through a dummy company.**

102.     In addition to providing beach vacations and two cash payments, FSM funneled money directly to Miller to reward him for his efforts.

103.     FSM did so by bribing Miller with a percentage of the money that Amtrak paid FSM.

104.     FSM and its officers concealed these bribes through a dummy corporation. In December 2015, Gonzales came up with the idea and urged Crothers to present it to Miller.

105.     Crothers therefore discussed with Miller the possibility of creating a sham business called "Miller Consulting."

106.     Miller took the bait. About a month later, he created Miller Consulting to conceal FSM's bribes under the guise of consulting services.

107.     The company existed only on paper. "Miller Consulting" performed no services of any kind for FSM or any other person or entity.

108.     At least one of FSM's officers helped Miller create false invoices to facilitate the bribery payments. On or about February 24, 2016, Miller emailed Crothers a blank invoice in the name of "Miller Consulting," purportedly for "Supply chain and logistics Services." Miller asked, "What do you think?"

109.     Crothers—using his FSM email address—forwarded Miller's invoice to Gonzales for approval, asking, "Look good?"

110.    In response, Gonzales—likewise using his FSM email address—suggested that FSM create a sham consulting contract to further cover up FSM's bribes and make them appear "more legit." Specifically, Gonzales wrote:

> SC,
>
> Invoice looks fine.  However, let's make the business more legit by covering the arrangements with a Contract.  Attached is a simple template which please fill up the information as applicable.

111.    Crothers proposed the arrangement to Miller, telling him to "See John's comments below big guy!"

112.    Within minutes, Miller signed the sham contract with FSM. According to the contract, Miller would be providing "Supply Chain and Logistical Services" to FSM.

113.    In exchange, FSM agreed to pay Miller .5% of the value of Amtrak's monthly orders.

114.    On or about February 24, 2016, Miller emailed Crothers the signed contract.

115.    Crothers forwarded it to Gonzales to review.

116.    That same day, Miller emailed a checking account number and bank routing number to Crothers and Gonzales at FSM.

117.    FSM did not delay its response: Crothers sent the following message back to Miller: "Bam!"

118.    Miller then created multiple sham "Miller Consulting" invoices for "supply chain and logistics services" that FSM knew he had never performed, including the following:

| Company Name | Date of Invoice | Amount |
|---|---|---|
| Miller Consulting | February 16, 2016 | $1,433.39 |
| Miller Consulting | March 30, 2016 | $2,304. 27 |
| Miller Consulting | April 27, 2016 | $929.96 |
| Miller Consulting | May 27, 2016 | $1,817.1 2 |
| Miller Consulting | September 2, 2016 | $1,294.75 |
| Miller Consulting | October 5, 2016 | $2,603.70 |
| Miller Consulting | November 7, 2016 | $1,269.35 |
| Miller Consulting | December 7, 2016 | $890.24 |

119.     Miller emailed Gonzales these "invoices" seeking payment from FSM.

120.     Gonzales instructed FSM's Comptroller, Jennifer Rose, to pay Miller.

121.     In one such instance, on December 6, 2016, Miller sent Gonzales and Crothers his November 2016 Miller Consulting Invoice for $890.24. Gonzales forwarded it to Crothers and asked him verify the amount.

122.     Crothers did so. The amount equaled .5% of the orders received that month, consistent with FSM's sham agreement with Miller Consulting, so Gonzales approved it for payment.

123.     But FSM's bribery was not always this seamless. During a 2016 audit, auditors questioned the $7,500 in cash that FSM paid Miller on August 4, 2015, previously discussed in ¶ 55.

124.     Rose asked Gonzales and Crothers for supporting documentation, but no such documentation existed for a bribery payment.

125.     So FSM made it up. On or about March 16, 2017, Crothers asked Miller: "Can you [Miller] create an invoice dated 8/4/15 for a cash payment in the amount of $7500. Going through a financial audit and need something for this payment I made to you. You can indicate it was for consulting services, etc. ☺"

126.     That same day, Miller emailed the requested invoice to Crothers.

127.     Rose questioned the invoice because she thought it would be inappropriate to pay Miller as a consultant due to his position with Amtrak.

128.     Because bribery was FSM's business model, Gonzales told Rose that the cash payment was necessary for FSM to win Amtrak contracts.

**V.     Other FSM executives knew about the scheme and continued it.**

129.     The foregoing allegations show that Gonzales and Crothers—the company's executive vice president, chief financial officer, and vice president for marketing and administration—advanced FSM's bribery scheme, but they were not alone.

130.     In addition to those corporate officers, additional high-level executives at FSM knew that the company paid bribes to Miller and did nothing about it.

131.     As described above, FSM's former President, Dave Hitchens offered to pay for Miller's Rehoboth Beach vacation in exchange for an Amtrak contract.

132.     After Miller took the paid vacation, Hitchens sought "assurances" from him that FSM would receive the Original Cushion Contract.

133.     Other FSM employees also knew Miller received illicit payments. During the week of April 4, 2016, FSM held its weekly administrative meeting during which it distributed a "Salient Financial Information" sheet describing the company's upcoming bribe to Miller.

134.    FSM hosted at least two types of regular meetings: the Executive Meeting and the Administrative Meeting. Because the Miller Consulting scheme was included on a weekly agenda for an Administrative Meeting, the scheme with Miller reached levels of the company deeper than the executives.

135.    The sheet listed "Miller Consult. -$2.3k." Three days later, FSM paid Miller $2,304.27 through Miller Consulting.

136.    On April 7, 2016, Crothers texted Miller that FSM's management, Gonzales and Hitchens, wanted to speak with him. Miller called him immediately.

137.    Within hours of the phone call, Miller texted Crothers: "Got the money today. All good."

**VI.    FSM's owners knew about the bribery scheme and did nothing to stop it.**

138.    Hitchens died unexpectedly on May 13, 2016, leaving FSM without a president. FSM's management—Mr. Valenzuela, Mrs. Valenzuela, Crothers, Gonzales, and Paul Fazzini, a subordinate of Gonzales—met the next day to discuss FSM's leadership structure. Mr. Valenzuela and Mrs. Valenzuela resumed control of the company.

139.    FSM's owners, Mrs. Valenzuela and Mr. Valenzuela, tried to keep Miller happy so that FSM could continue receiving contracts.

140.    As one way to do that, Mrs. Valenzuela and Mr. Valenzuela entertained the prospect of purchasing financial services from Miller's side business with a life insurance and financial services company.

141.    Despite knowing that Miller worked for Amtrak and handled FSM's contracts, Mr. Valenzuela and Mrs. Valenzuela communicated with him about purchasing life insurance in order to continue and preserve FSM's corrupt relationship.

142.    In or around July 2016, Mrs. Valenzuela met Miller in Philadelphia to hear about his side business. Although she had no interest in purchasing insurance, Mrs. Valenzuela nonetheless expressed an interest in purchasing it from him.

143.    Stringing him along further, on or about July 26, 2016, Mrs. Valenzuela told Crothers to invite Miller to dinner and offered to pay for Miller to take a vacation in Rehoboth Beach, Delaware.

144.    Not wanting to rock the boat, Mrs. Valenzuela continued to feign interest in purchasing insurance products. On August 18, 2016, Mrs. Valenzuela responded to an email from Miller offering to sell her life insurance: "John mentioned this to me this week, and we're in agreement we'd like to discuss in greater detail."

145.    Mrs. Valenzuela, Gonzales, and Crothers therefore planned to meet with Miller for dinner on September 2, 2016 to discuss purchasing life insurance. Although the dinner was postponed, Mrs. Valenzuela continued to communicate with Miller about scheduling a meeting through September 2016.

146.    Mrs. Valenzuela next entertained the possibility of Miller providing financial services products to FSM. On November 4, 2016, Miller emailed Mrs. Valenzuela, Mr. Valenzuela, and Gonzales "to setup a 15-20 minute conference call to discuss the next steps and progress of the 401K for First State [i.e., FSM]."

147.    Mrs. Valenzuela responded by asking Gonzales to "look into arranging a call[.]"

148.    On November 15, 2016, Mrs. Valenzuela instructed Gonzales "to calendar the event for an actual day in January, 2017." Rather than admit her purpose of keeping Miller happy, she attributed the meeting to her selfless generosity in promoting small businesses. As

Mrs. Valenzuela put it, "I'd like to give him the courtesy of [the meeting], based on the fact that he's trying to start his own business and I do value that."

149.    Mrs. Valenzuela and Mr. Valenzuela continued to placate Miller by stringing him along with the prospect of selling financial services to FSM and the Valenzuelas directly in order to continue FSM's corrupt arrangement with Miller.

150.    Mrs. Valenzuela and Mr. Valenzuela never purchased the insurance or financial products. But to keep Miller happy, Crothers ultimately purchased from him a life insurance policy and set up a Roth Individual Retirement Account ("IRA").

**VII.    FSM's owners received tips about FSM's bribes**.

151.    While FSM's management was trying to placate Miller and keep the bribery scheme alive, at least two individuals complained about the scheme to Mrs. Valenzuela and Mr. Valenzuela.

152.    The first complaint came in a written letter. On December 1, 2016, Mr. Valenzuela and Mrs. Valenzuela received a letter from Rachel Hitchens, Dave Hitchens' widow, in which she asserted that FSM illegally secured the Amtrak contracts.

153.    Rachel Hitchens wrote that Dave Hitchens "left behind personal notes and journals along with a legal opinion he received in reference to consequences of illegal workplace activities such as paying for receipt of private and confidential information submitted by vendors," among other things.

154.    Rachel Hitchens told Mrs. Valenzuela and Mr. Valenzuela that the "notes and journals clearly expresses [sic] Dave's concern for you and your company and his belief that your dependence on [Gonzales] for financial guidance both personally and professionally sometimes lead you to condone this unethical and possibly criminal activity. His notes indicate

that he warned you both about the consequences of this activity and for a period of time believed that you had stopped until [Gonzales] *approved another illegal agreement with Tim Miller*." (emphasis added)

155. Mrs. Valenzuela and Mr. Valenzuela did not respond. Undeterred, on December 15, 2016, Rachel Hitchens forwarded her letter to Gonzales and carbon copied Mr. Valenzuela and Mrs. Valenzuela.

156. At that point, Mrs. Valenzuela finally responded that she was "surprised, puzzled, and quite disappointed." She described the widow's allegations as false, writing that "[m]ost of the information in your letter is inaccurate, untrue, and certainly libelous. I don't know from whom you are getting your information, but it's quite clear that you are on a fishing expedition."

157. The second complaint came from an FSM employee a few weeks later. On December 16, 2016, an FSM employee told Mr. Valenzuela that "[t]he Amtrak contract was only won [ ] through illegally receiving the bids of [FSM's competitors.] The [FSM] bid price was at least 30% higher then [sic] the competition. The CFO and VP of Sales lowered our bid price with no basis."

158. Despite receiving these tips, the company did not change its behavior.

159. FSM eventually caught the attention of federal authorities. Nearly a year later, on November 15, 2017, federal agents executed a search warrant of FSM's facility.

160. To give the false appearance of cleaning up FSM's management after the search warrant, in January 2018, FSM management pretended to place Crothers and Gonzales on administrative leave.

161. But FSM management privately did the opposite, knowing that the company needed both to continue working for FSM.

162.     FSM management therefore asked Gonzales and Crothers to continue working for FSM, under the radar, from Crothers' residence located directly across the street from FSM's facility, until February 2018.

163.     FSM management told Crothers and Gonzales to rent furniture and purchase new laptop computers, and an FSM owner delivered their email to them so that they could continue working for FSM.

164.     Even though FSM management knew about the scheme since at least December 2016—when two different people told them about it—FSM continued bribing Miller with lavish beach vacations through September 2017.

## VIII.   FSM's bribery scheme damaged Amtrak.

165.     FSM's scheme damaged Amtrak's procurement process and caused additional financial losses.

166.     Among these losses, FSM charged Amtrak more than $65,000 to recover costs the company incurred during its vendor approval process. Miller processed FSM's invoices for these costs, but not for FSM's competitors.

167.     Amtrak incurred additional costs through delays that FSM caused through its substandard cushions.

168.     When FSM submitted prototype seat cushions to Amtrak for approval, it agreed to use molded foam pursuant to Amtrak specifications. But when FSM manufactured the seat cushions later, it used a cheaper foam that failed to meet Amtrak's specifications and did not fit the seats.

169.     FSM cushions were also missing stitching needed to secure the cushions.

170.    Amtrak employees complained about the quality of FSM's cushions, and Amtrak had to quarantine all of the cushions for inspection.

171.    Amtrak subsequently determined that although some of the cushions complied with the contract specifications, many did not. These out-of-specification problems included fitting the upholstery improperly, gluing the upholstery rather than sewing it, and using the incorrect foam.

172.    FSM supplied noncompliant cushions because it knew that Miller—who had accepted FSM's cash bribes—would support the company no matter what.

173.    While Amtrak and FSM negotiated a potential resolution of the quality issues, Mr. Valenzuela, Mrs. Valenzuela, Gonzales, and Crothers tried to obtain additional inside information from Miller.

174.    Specifically, on July 1, 2016, Gonzales emailed Mrs. Valenzuela and Mr. Valenzuela to relay information that Miller had given him, including when Amtrak would reply to FSM's Cure Notice Corrective Action Plan letter, when Amtrak would consider granting waivers, and whether Amtrak would resume purchasing from FSM.

175.    Although FSM and Amtrak eventually negotiated a cure for the problems with the seat cushions, FSM—the sole source seat cushion supplier—submitted pricing for subsequent contracts in order to recover the cost of the cure.

176.    Moreover, FSM failed to pay Amtrak approximately $43,250.06 of the agreed upon cure amount.

177.    Adding to these quality problems and costs, Miller raised prices in FSM's favor and to Amtrak's detriment. On February 3, 2017, he talked to Crothers about FSM's pricing on the purchase of a seat cover. Miller told Crothers, "I did change 1 price back to 17.08 in FSM

favor." Then, via email, Miller instructed Crothers to make sure he told Gonzales "about the change I made in FMS's favor. HAHA."

178.    Further, Miller accepted out-of-specification products from FSM and raised the price that Amtrak paid for them.

179.    For example, the Renewal Carpet Contract required FSM to supply materials that contained holes with grommets to prevent the product from ripping.

180.    FSM nevertheless furnished carpet seat back without holes or grommets.

181.    When Amtrak complained, FSM punched holes in the carpet seat back, but failed to install the required grommets.

182.    FSM shipped the carpet seat backs anyway, knowing that Miller would support it because of the company's bribes.

183.    FSM was right that its bribes would continue to pay off. In or around March 2017, Miller learned that Amtrak's quality assurance analyst had returned the seat carpet to FSM because it failed to have holes, proper cuts, or correct dimensions.

184.    Although FSM had to spend money to fix those quality problems, it recouped its costs from Amtrak. In October 2017, Crothers asked Miller to increase the price of the carpet seat backs provided to Amtrak by $15 per piece to cover the cost of adding the holes—the same ones that the original contract had required.

185.    Without justification, Miller manually changed FSM's price of the carpet seat back by $15 per piece within Amtrak's procurement software.

186.    As a result, Amtrak paid FSM additional money to which it was not entitled.

### IX.   Summary of FSM's bribery of Tim Miller.

187.   In summary, in return for steering Amtrak contracts to FSM, the company gave

Miller the following monetary compensation:

**<u>Cash or other Monetary Compensation</u>**

| Date of Payment Authorized by Gonzales and Crothers from FSM to Miller | Amount |
|---|---|
| August 4, 2015 | $7,500 |
| January 30, 2016 | $2,500 |
| March 10, 2016 | $1,433.39 |
| April 7, 2016 | $2,304.27 |
| April 29, 2016 | $929.96 |
| June 3, 2016 | $1,817.12 |
| September 9, 2016 | $1,294.75 |
| October 17, 2016 | $2,603.70 |
| November 21, 2016 | $1,269.35 |
| December 18, 2016 | $890.24 |
| **Total** | $22,542.78 |

**Trips, Entertainment, or Other Compensation**

| Approximate Date of Weekend Trip | Destination |
|---|---|
| June 20-22 2014 | Rehoboth Beach, Delaware |
| October 10-12, 2014 | Rehoboth Beach, Delaware |
| February 20-22, 2015 | Rehoboth Beach, Delaware |
| October 23-24, 2015 | Rehoboth Beach, Delaware |
| April 29-30, 2016 | Rehoboth Beach, Delaware |
| July 2016 | Rehoboth Beach, Delaware |
| September 2016 | Rehoboth Beach, Delaware |
| September 2017 | Rehoboth Beach, Delaware |

188.     To pay for these trips, FSM used a company debit card at WSFS Bank.

189.     FSM orchestrated the bribery scheme to maintain the flow of money to its coffers. Crothers described Amtrak as FSM's "cash cow" and told Miller it was "[c]ritical that FSM maintain the Amtrak contracts." He added: "[w]hatever I need to do – I will do it."

**X.      FSM'S bribery scheme resulted in criminal convictions.**

190.     On April 19, 2018, Miller pleaded guilty to one count of aiding and abetting a federal program bribery in violation of 18 U.S.C. §§ 666(a)(1)(B) and 2. Amtrak fired Miller on November 16, 2017. Miller was sentenced to one year and one day incarceration.

191.     On February 4, 2019, Crothers pleaded guilty to one count of aiding and abetting a federal program bribery in violation of 18 U.S.C. §§ 666(a)(1)(B) and 2. Crothers was sentenced to eighteen months incarceration.

192.     On February 5, 2019, Gonzales pleaded guilty to one count of aiding and abetting a federal program bribery in violation of 18 U.S.C. §§ 666(a)(1)(B) and 2. As of this filing, Gonzales is still awaiting sentencing.

193.     The United States brings this civil action seeking to hold FSM accountable as the remaining participant in the bribery scheme.

### COUNT I
### Violation of the False Claims Act: Presentation of False Claims
### (31 U.S.C. § 3729(a)(1))

194.     The United States incorporates by reference paragraphs 1 through 193 as though fully set forth herein.

195.     This is a claim against defendant for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended, for knowingly presenting or causing to be presented false or fraudulent claims to the United States.

196.     FSM presented, or caused to be presented, false or fraudulent claims to the United States for cushions, carpet, flooring, seat backs, and other parts, materials, and labor.

197.     FSM did so knowingly. The False Claims Act defines "knowingly" as meaning that a defendant "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b). The definition requires "no proof of specific intent to defraud." *Id.*

198.     By paying bribes, FSM fraudulently induced Amtrak to enter into each contract and to pay each invoice submitted by FSM.

199.     But for the bribery scheme, Amtrak would not have awarded contracts to, or paid invoices submitted by, FSM.

200.    FSM's bribery rendered its submission of bids and invoices fraudulent because FSM lulled Amtrak into thinking that the bids were competitive.

201.    FSM obtained by fraud every federal dollar that Amtrak paid, because the company's bribery scheme "did not spend itself with the execution of the contract. Its taint entered into every swollen estimate [and invoice] which was the basic cause for payment of every dollar paid[.] The initial fraudulent action and every step thereafter taken, pressed ever to the ultimate goal—payment of government money to persons who had caused it to be defrauded." *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 543-44 (1943).

202.    FSM knew that it secured each and every payment from Amtrak through its unlawful bribery and kickback arrangement with Tim Miller.

203.    From May 14, 2014 until April 30, 2018, FSM submitted 1,249 invoices to Amtrak for payment. Each of these invoices was tainted by FSM's bribery scheme.

204.    FSM utilized this improper relationship with Miller to obtain bidding information.

205.    After obtaining confidential bidding information, FSM undercut other bidders.

206.    Once the contracts were secured, Miller, at FSM's bidding, increased the price of certain contracts, items, and invoices, without appropriate justification.

207.    These actions damaged the United States by causing Amtrak to overpay for materials and labor as well as incur investigative and administrative costs. These actions further damaged the United States by undermining the integrity and fairness of the Amtrak procurement system.

208.    By reason of the false or fraudulent claims that FSM presented or caused to be presented, the United States is entitled to three times the amount by which it was damaged, plus

a civil penalty of not less than $10,781 and not more than $21,563 for each false claim presented or caused to be presented.

## COUNT II
### Violation of the False Claims Act: Conspiracy to Violate the False Claims Act
### (31 U.S.C. § 3729(a)(1)(C))

209.    The United States incorporates by reference paragraphs 1 through 208 as though fully set forth herein.

210.    This is a claim against FSM for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(C), as amended, for FSM executives, FSM employees, and Timothy Miller's conspiracy to violate the False Claims Act.

211.    In August 2013, Mr. Valenzuela told Scott Crothers, John Gonzales, and Dave Hitchens that inside pricing information from Amtrak is valuable and encouraged them to keep such information secret. Thereafter, FSM, Crothers, Gonzales, and Hitchens preceded to bribe and provide kickbacks to Timothy Miller, an Amtrak procurement official, in exchange for lucrative Amtrak contracts.

212.    FSM, through its executives, plied Miller with cash and vacations to gain Miller's allegiance to FSM. First, FSM entered into an agreement with Miller. Under this agreement, FSM provided Miller with monetary bribes and kickbacks in the form of vacations, and in return, Miller put his finger on the procurement scales at Amtrak to favor FSM. From Spring 2014, this agreement benefited Miller and FSM, to Amtrak's detriment.

213.    Second, in late 2015, FSM, through the actions of its executives, entered into a corrupt arrangement with Miller to pay Miller a kickback of .5% of all Amtrak contracts that FSM secured with Miller's help. In addition to this kickback, FSM continued to provide Miller with vacations to Rehoboth Beach to ensure he continued to act on behalf of FSM, despite his

employment with Amtrak. FSM's and Miller's corrupt arrangement lasted until at least April 2018, when Miller pleaded guilty to a federal program bribery charge.

214.    Third, Miller received several vacations paid for by FSM. In exchange, Miller steered Amtrak contracts to FSM.

215.    This corrupt arrangement also allowed FSM to submit claims for shoddy textile products and inflated prices that Amtrak would not have paid but for Miller's corrupted approval.

216.    FSM also continued their illicit agreement to violate the False Claims Act by attempting to cover up the bribery and kickback scheme after FSM was searched by federal authorities in November 2017.

217.    These actions damaged the United States by causing Amtrak to overpay for materials and labor as well as incur investigative and administrative costs. These actions further damaged the United States by undermining the integrity and fairness of the Amtrak procurement system.

218.    By reason of the false or fraudulent claims that FSM presented or caused to be presented, the United States is entitled to three times the amount by which it was damaged, plus a civil penalty of not less than $10,781 and not more than $21,563 for each false claim presented or caused to be presented.

### COUNT III
### Unjust Enrichment

219.    The United States incorporates by reference paragraphs 1 through 218 as though fully set forth herein.

220.    By conspiring to bribe and, ultimately bribing an Amtrak Contract Administrator, FSM wrongfully secured contracts from Amtrak.

221.    If Amtrak had known that FSM secured its contracts through bribery, it would not have paid FSM under those contracts.

222.    FSM received benefits and proceeds from Amtrak—in the form of compensation paid for textile and cushion contracts—that would be unconscionable for FSM to retain without compensating the United States.

223.    Although FSM had no direct contract with the United States, Amtrak used United States grant funding to contract with FSM for approximately $8.3 million in contracts, in which $6.7 million are tied with federal grants. Amtrak then paid that amount to FSM in accordance with the fraudulently obtained contracts.

224.    These actions damaged the United States by causing Amtrak to overpay for materials and labor as well as incur investigative and administrative costs. These actions further damaged the United States by undermining the integrity and fairness of the Amtrak procurement system.

## COUNT IV
## Payment by Mistake of Fact

225.    The United States incorporates by reference paragraphs 1 through 224 as though fully set forth herein.

226.    By conspiring to bribe and, ultimately bribing an Amtrak Contract Administrator, FSM wrongfully secured contracts from Amtrak.

227.    If Amtrak had known that FSM secured its contracts through bribery, it would not have paid FSM under those contracts.

228.    FSM received benefits and proceeds from Amtrak—in the form of compensation paid for textile and cushion contracts—that would be unconscionable for FSM to retain without compensating the United States.

229.    Although FSM had no direct contract with the United States, Amtrak used United States grant funding to contract with FSM for approximately $8.3 million, which Amtrak then paid to FSM in accordance with the fraudulently obtained contracts.

230.    These actions damaged the United States by causing Amtrak to overpay for materials and labor as well as incur investigative and administrative costs. These actions further damaged the United States by undermining the integrity and fairness of the Amtrak procurement system.

## CLAIM FOR RELIEF

WHEREFORE, the United States of America demands judgment against First State Manufacturing, Inc. as follows:

a.  Treble the damages sustained by the United States, as mandated by 31 U.S.C. § 3729(a)(1);

b.  Civil penalties of between $10,781 and $21,563 for each false claim, as mandated by 31 U.S.C. § 3729(a)(1) and 81 Fed. Reg. 42491, *42494 (2016) (adjusting penalty amounts for inflation); and

c.  Post-judgment interest, costs, and such other and further relief as the Court deems just and equitable.

Respectfully submitted,

WILLIAM M. McSWAIN
United States Attorney

GREGORY DAVID
Digitally signed by
GREGORY DAVID
Date: 2020.11.13
09:42:54 -05'00'

GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

CHARLENE KELLER FULLMER
Assistant United States Attorney
Deputy Chief, Civil Division

PAUL J. KOOB
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Ph:     (215) 861-8432
Fax:    (215) 861-8618
Paul.Koob@usdoj.gov

*Attorneys for the United States of America*

Dated: November 17, 2020

41